No. 3323.

CHRISTIAN SCHWARTZ VS. THE CRESCENT-CITY RAILROAD COMPANY.

Where the evidence shows that the plaintiff, who was injured by a collision with a railroad car, contributed by his own fault to bring about the collision, he can not recover damages from the railroad company on account of the injury, even though the employees of the company were partly in fault.

| 30 | 15 |
| 45 | 1203 |
| 30 | 15 |
| 46 | 210 |
| 30 | 15 |
| 50 | 1088 |
| 30 | 15 |
| 109 | 49 |

APPEAL from the Seventh District Court, parish of Orleans. *Collens, J.*

*Cotton & Levy* for the plaintiff.

*John M. Bonner* and *Percy Roberts* for defendants and appellants.

The opinion of the court was delivered by

DeBLANC, J. On the ninth of September 1869, plaintiff brought suit

against defendant for $10,000. He claims that amount for damages actually sustained by him, through the gross neglect and carelessness of one of defendant's employees. His demand is based on the alleged fact that, on the fifth of January, 1869, without any fault on his part, he was run over by car No. 22 belonging to defendant, and permanently disabled.

The railroad company filed an exception to plaintiff's petition and a general denial. The exception is that the allegations of the demand are vague, inconsistent and contradictory. It was overruled, not urged or noticed on the trial in this court, not referred to in appellant's brief, and—as and with the parties—we leave unnoticed the abandoned exception and enter the field of the merits.

Christian Schwartz is over sixty years of age, and, before he was disabled, kept a tinshop. He has a grown daughter. They now rely, for their support, on the daughter's labor, and charity. Were the proportions of the victim's misfortune to be alone regarded in fixing the liability of defendant, the proportion of that liability could hardly be exaggerated; for, whether through a criminal and unpardonable neglect, or an unforeseen and unavoidable accident, an industrious artisan has, in a moment, seen his indefatigable hand converted into a stiff and paralyzed hand which he now extends on the street, to provide, for himself, his destitute child and destitute home, the strict necessities of the humblest life.

We will not attempt to disguise or reduce the sad result of this sad disaster; we will not criticise the sympathies which it may have awakened even on the jury's bench, but, in the faithful discharge of our stern duty, we have but two guides, the evidence and the law. The sympathies, the prejudices, the passions which move and sway the public mind, should not be allowed to steal admittance in a court of justice.

The infliction of the alleged injury is fully established. We have, now, to ascertain the cause of that injury. If imputable to defendant, the verdict shall not be disturbed—if imputable to plaintiff, we shall cancel the verdict and dismiss his demand.

Two of the witnesses, Frank Waites and Henry Miller, testified that plaintiff crossed from the banquette on the lake side of Tchoupitoulas street, took a position near the railroad track, as if intending to get on the approaching car. The car was then moving at the usual rate, the driver's right hand was on the brake, and, from his attitude and his looks, he seemed to be under the same impression as those witnesses. When the mule was nearly on Schwartz, he rushed across the track and was either knocked down by the mule or slipped and fell, his hand was caught between the chain of the brake and the bottom of the platform; his body was and remained at fully two feet from the wheels.

Schwartz vs. the Crescent-City Railroad Company.

Dr. Brickam, a witness for plaintiff, was asked; "Could the chain, by pressing the hand against any other substance, inflict such a wound as that described by plaintiff?" He answered: "I think it possible; yes, quite possible." The doctor's answer, though not absolutely confirming, adds at least a probability to the declaration of those witnesses; and, though the weight of a loaded or unloaded car was not proven, is it not evident that if the whole of such a weight had pressed the hand between the iron wheel and the iron rail, the pressed portion—flesh and bones— would have been severed from the rest and would have remained on the track?

The testimony of Waites and Miller was assailed and ridiculed; they were suspected of having been hired for the occasion and bribed to rehearse a prepared lesson. It must have been the jurors' conviction, as, otherwise, their verdict could not be accounted for or justified. As to us, we do not find in their evidence those bold contradictions, that hesitating incoherence, which, generally, brands the fabrication of the perjurer, or the lesson he is paid to repeat. Be this as it may, they are suspected and we dismiss them.

Miss Schwartz, the daughter of plaintiff, said: The accident happened on a very clear and very pleasant day; on that day her father was not as deaf as usually. Not only his hands were crushed, but he also had a deep wound on the left side of his back. When he was brought home after the accident, his body and arm were covered with mud.

Plaintiff fell — this is proven, the head to the river, the feet to the swamp. If, in that position, he was run over, how account for the wound mentioned by his daughter? The wheel, in that position, could strike him but on the right, unless he fell on his back; and the wound was on the left side.

Sworn in his own behalf, Schwartz said: "On the fifth of January, 1868, I was run over by the Tchoupitoulas car, between Josephine and Jackson. I came out of my house, and—when crossing the street—I slipped, fell, and the car ran over me. The mule passed me; I did not come in collision with it. Before the car got close to me, I hallooed 'Stop! Help me!' When I fell, the car was about eight or nine feet from me." "The car, or the mule?" inquired his counsel. He answered; "the car." * * * I believe that, at that moment, I was out of my senses." "Did you observe, before falling, what the driver was doing, or did you see the car before you fell?" "I did not see the car, and do not know what the driver was doing." He was again asked: "Had you seen the car before you fell?" "I had; but it was off, on the other side of Jackson street. When I hallooed, a lady who is now dead came out and tried to assist me. She hallooed at the driver, and *he stopped as*

*soon as he possibly could.*" His counsel repeated the already propounded question : " How far off was the car, when you fell ?" " From eight to nine feet." The judge then addressed him : " Was it the car or the mule," he asked, " which was about eight or nine feet ?" " That was the car:" he afterward said it was the mule, and, as well as he could judge, the mule and the car. Further on, he stated he was about five feet from the mule, and, lastly, about seven.

Who, in the conflicting fragments of that confused evidence, can discover whether it was before or after he fell, that plaintiff saw the car ?' To one question, he answered : " I did not see the car before falling"—to the other : " When he saw the car, it was off, on the other side of Jackson street." Where he was at that time, whether at his door, on the banquette, near to or on the track, we are at a loss to ascertain. How and how far from the car did he fall ? He said and repeated at eight or nine feet from the car, then eight or nine feet from the car and the mule, and afterward seven or five feet from the mule.

We do not believe, much less do we charge, that he willingly swore to a falsehood, but grave contradictions cloud and darken nearly every line of his declaration.

He fell across the track, and—nevertheless—the mule passed him without coming in collision with him. How could that happen, unless—as stated by Waites, the mule shied and left the track ? How did it happen that though, as alleged in his pleadings, he was crossing the street from the river side, he fell with his head toward the river ? A fall, without a collision, would have had a different, an opposite result : his head would have been toward the swamp, his feet toward the river ; that position, otherwise inevitable, must and could have been so reversed but by a collision, a shock.

Was his entire body, or were only his arms and hands across the track, after the fall ? The record does not indicate, and we have to retrace our steps, enter the past, place ourselves where the witnesses stood, see what they have seen and hear what they have heard. Schwartz leaves his house, follows the banquette up to the point where, every morning, he is in the habit of crossing, turns at that point, gets in the street, and is about to step over the track ; he hears and sees the car, stops, hesitates, measures the distance from the car and that which he has to cross, believes that he has time to cross, rushes ahead, is struck by the mule, falls nearly senseless, his hand is caught in the chain brake and drops from it as soon as the brake is slackened.

For the convenience and with the consent of their inhabitants, the streets of our American cities are now lined with rails and traversed, in every direction, by those constantly-moving cars which, for the most reasonable fare, convey—in a few moments—from their residence to their

Schwartz vs. the Crescent-City Railroad Company.

place of business, and from that often distant place back to the residence, the merchant, the clerk, the minister, the attorney, the judge, the pro- prietor, the servant, the rich and the poor. In return for that priceless convenience, each of these inhabitants has, impliedly at least—renounced, of his right to stand and walk on those streets, that fractional, that insig- nificant share which is indispensable to accelerate the general circulation. The car is not to be stopped at every minute to let the footman pass—the footman must stop, sacrifice a second, when necessary, to let the car pass. The driver is authorized to presume that no rational being shall remain on the track, while the car is advancing, and he who crosses the track, when the car is at a distance within which it can not be checked, takes upon himself the risks of any accident which may be the consequence of his act..

What is that distance? It then varied, according to circumstances, from three to thirty-two feet. This is the evidence introduced on the trial, and that evidence leaves us on a shoreless sea of doubt and uncer- tainty. It clearly shows that the possibility and the power to stop within the given distance, depends upon the quality of the brake, the strength of the driver, that of the mule, the pull which immediately precedes the checking, the load carried, the weight of the car, the condition of the weather, of the track, and the unobserved and untold causes which accelerate or obstruct the speed of a vehicle and the evolutions of its wheels. Two experiments made successively, with the same car, the same driver, the same mule did not produce the same result, and—from the evidence before us—we are inclined to believe that, at that time, with different cars, brakes, mules and drivers, one hundred experiments made on the same day would have produced one hundred different results. On one fact, the witnesses agree: when the weather and the track are dry, the cars can be more easily checked. On the fifth of January, 1869, what was the condition of the weather and the track? On this fact, the witnesses disagree: according to some, the day was pleasant and bright, accord- ing to others, damp and foggy. Two extracts from the New Orleans Picayune, of the fifth of January, 1869, fully establish that it had rained the day before, and that, on the fifth, in the language of the report pub- lished by that paper, "the morning dawned damp and foggy." Miss Schwartz testified that when her father was brought home after the accident, he was covered with mud. It is difficult not to believe that, on that day, no car could have been checked within less than twelve feet of an object, by one prepared to check at a point selected by him, and whose hand and body would have been in advance, placed in the most advantageous position to promptly check. If so, how could it have been expected that one taken by surprise, as was the driver of car No. 22, would have done more than one who experi-

ments with the deliberate intention of ascertaining the shortest distance within which a car can be checked? When Schwartz fell, he was about eight or nine feet from the car, and—nevertheless—the wheel did not reach his body: he "would not have been hurt," said Waites, "had he not thrown up his hand." This declaration shows that, when the driver realized that he had been deceived by plaintiff's attitude, or when the latter was knocked down or fell on the track, the driver, as stated by plaintiff himself, stopped *as quick as he possibly could.*

If Schwartz's body was at two feet and a half from the wheel of the car, all he had to do to avoid it was to fold his arm and to draw his hand toward his body; but the motion, by which he entangled it in the chain, would have been that of almost any one in his position; the first idea of one threatened with a collision is to raise the hand and place it between the exposed body and the object by which it is threatened.

Plaintiff's counsel contends that, if such brakes as were used by other companies had been attached to defendant's car, or a conductor placed on the same, the driver would have been able to stop it in time to avoid the injury. We believe otherwise; under the circumstances already related, neither a more efficient brake, if any better then existed, nor the presence of a conductor in the car, could have prevented the accident—for, above the differences and contradictions which mark every page of this record, there stands a presumption which we can not disregard: Schwartz was standing near the track, and, by his attitude, led the driver to imagine that he intended to get on the car, and, when the mule was almost on him, he rushed across the track and was injured. By whose fault?

Sworn and examined as a witness, plaintiff has failed to justify his complaint; he has failed to show that his injury was inflicted through the carelessness and negligence of the driver; he has failed to show that he acted, on that occasion, with that degree of caution required from those who enter a court to denounce the negligence of others. The whole of the evidence, not excepting his own, leads to the conclusion that plaintiff has contributed to the disaster, and—under the law and jurisprudence of our State—he could not recover, even if the driver had been partly in fault.

23 An. 264, 462, 729; 3 An. 48; 9 An. 441; 18 L. R. 339; 6 An. 496; 11 An. 292; 1 An. 374; 3 An. 411; Redfield on Railways, 119, 117.

Whatever may be, as to the question of facts, the respect due by this court to the verdict of a jury, we can not so extend and exaggerate that respect as to sustain a verdict unsupported by even the declaration of the party in whose favor it was returned.

Under the evidence and the law, defendant is not liable to plaintiff; but, under the circumstances which surround this sad accident, this real

misfortune, plaintiff is now—not a beggar—but the creditor of society or of the State, for whatever is necessary to one of his age and condition.

It is, therefore, ordered, adjudged and decreed that the judgment of the lower court be and it is hereby annulled, avoided and reversed, the verdict of the jury set aside and plaintiff's demand rejected at his costs in both courts.